# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

FACILITIES HOLDINGS, LLC,

    Plaintiff,

v.

ASM GLOBAL PARENT, LLC,

    Defendant.

C.A. No. 2025-0670-JTL

## OPINION REGARDING MOTION TO DISMISS

Date Submitted: March 3, 2026
Date Decided: June 24, 2026

Christopher B. Chuff, TROUTMAN PEPPER LOCKE LLP, Wilmington, Delaware; *Attorney for Plaintiff Facilities Holdings, LLC.*

Michael A. Barlow, Morgan R. Harrison, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Wilmington, Delaware; R. Brian Timmons, Anthony P. Alden, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Los Angeles, California; *Attorneys for Defendant ASM Global Parent, LLC.*

**LASTER, V.C.**

ASM Global Parent, LLC (the "Operator") owns, manages, and operates sports and entertainment venues. Facilities Holdings, LLC (the "Vendor") provides concession services at sports and entertainment venues. The Operator granted the Vendor the right to serve as the exclusive food and beverage vendor for many of its venues, including Arena Wembley in London and the Hawai'i Convention Center in Honolulu.

The Operator and the Vendor executed a concession agreement for each venue and a master agreement covering all the venues. Under the master agreement, the Vendor had the option to extend the term of each concession agreement.

For nearly a decade, the Operator never raised any systemic or serious issues with the Vendor's performance. During this period, the Vendor and the Operator regularly extended the concession agreements.

Then one of the Vendor's competitors acquired the Operator. The master agreement provided that if the Operator was sold, then the concession agreements for Arena Wembley and the Hawai'i Center could not be extended without their landlords' consent.

The Vendor exercised its extension right for the concession agreements for the two venues. The Operator claimed that the landlords for the properties refused to consent and that the agreements would expire in accordance with their terms.

This action followed. The Vendor contends that behind closed doors, the Operator convinced the landlords to withhold consent so the Operator could replace

the Vendor with affiliates of its new owner. The Vendor contends that doing so breached both explicit and implicit terms in the master agreement.

The Operator moved to dismiss the complaint for failing to state claims on which relief could be granted. This decision grants its motion in part.

## I.    FACTUAL BACKGROUND

The facts are drawn from the operative complaint (the "Complaint") and the documents it incorporates by reference.[1] At this procedural stage, the court must credit the Complaint's well-pled allegations and draw all reasonable inferences in the plaintiff's favor.

### A.    The Master Agreement

By agreement dated July 29, 2011 and amended as of October 1, 2019 (the "Master Agreement"), the Operator agreed that the Vendor would serve as the exclusive food and beverage provider for many of its venues, including Arena Wembley and the Hawai'i Center.[2] The Operator and the Vendor entered into a concession agreement for each venue.

---

[1] Citations in the form "Compl. ¶ __" refer to paragraphs of the Complaint, which is the operative pleading. Dkt. 12. Citations in the form "Ex. __ at __" refer to exhibits to the Complaint. *Id.*

[2] Ex. C (cited as "MA"). Technically, ASM Global Parent, Inc. and two of its affiliates executed the Master Agreement. The distinctions among those entities are not relevant to this decision. Defendant ASM Global Parent, LLC is the same entity as ASM Global Parent, Inc., having converted into an LLC in 2024. *See* Compl. at 1 n.1.

Under the Master Agreement, the nature of the Vendor's rights depended on the type of venue. The Master Agreement distinguished between owned and unowned venues. For unowned venues, the Master Agreement distinguished between (i) venues the Operator managed ("Controlled Venues") and (ii) other venues. Arena Wembley and the Hawai'i Center were Controlled Venues.[3]

The Vendor had the exclusive right to provide food and beverage services at a Controlled Venue during the term of the concession agreement for that venue.[4] The Vendor had the option to extend the term of a concession agreement for a Controlled Venue by ten years.[5] The Master Agreement did not require any formal notice of extension, but it did require that the parties start negotiating the commission rates and other financial terms for the extension at least one year before the existing expiration date (the "General Negotiation Provision").[6] If the parties could not agree on terms at least six months before the expiration date, then the Master Agreement required that they arbitrate their dispute (the "General Arbitration Provision").[7]

---

[3] *See* MA § 1.2; *id.* at Ex. B.

[4] *Id.* § 3.1.

[5] *Id.* § 3.2.

[6] *Id.* § 5.2(a).

[7] *Id.* § 5.2(b).

3

The General Negotiation Provision required that the parties negotiate "reasonably and in good faith."[8] The Master Agreement also required that the parties "take . . . such further actions, as may be necessary, proper or advisable under applicable law to evidence and effectuate" the transactions contemplated by the Master Agreement (the "Further Action Provision").[9]

## B. The Concession Agreements For The Hawai'i Center And Arena Wembley

The Operator and the Vendor executed a concession agreement for the Hawai'i Center dated January 8, 2014 (the "Hawai'i Agreement").[10] Its original expiration date was December 31, 2018. Through a series of amendments, including an amendment in June 2023, the parties extended its term to December 31, 2023.

The Operator and the Vendor executed a concession agreement for Arena Wembley dated January 15, 2016 (the "Wembley Agreement").[11] Its original expiration date was November 1, 2024. In May 2021, the parties extended the term to November 1, 2025.

---

[8] *Id.* § 5.2(a).

[9] *Id.* § 7.1.

[10] Ex. A. Various affiliates signed the Hawai'i Agreement. Their involvement is not significant for purposes of this dispute.

[11] Ex. B. Various affiliates signed the Wembley Agreement. Their involvement is not significant for purposes of this dispute.

## C.    The Sale

In January 2023, Legends Hospitality, LLC ("Legends") began negotiating to acquire the Operator. Legends competes with the Vendor in the venue concessions industry. In November, Legends and the Operator announced that Legends would acquire the Operator for $2.325 billion.

The Master Agreement imposed different terms for extensions after a sale of the Operator. First, instead of a ten-year extension, the Vendor could extend a concession agreement by the greater of (i) five years or (ii) whatever additional time would yield an aggregate term of ten years from the date of execution.[12] The Master Agreement continued not to require any formal notice of extension.

Second, extending any concession agreement required consent from the landlord for that venue (the "Landlord Consent Requirement"). The landlord for Arena Wembley was Intermediate Capital Group (the "Wembley Landlord"). The landlord for the Hawai'i Center was the Hawai'i Tourism Authority (the "Hawai'i Landlord").

Third, the pertinent time periods shrank. They also revolved around the closing date for the sale of the Operator rather than the scheduled expiration date of a concession agreement. In connection with a sale of the Operator, the parties had to start negotiating fifteen days before the sale closed (the "Sale-Related Negotiation

---

[12] MA § 6.4.

Provision"). If they could not agree within forty-five days after the sale closed, they had to arbitrate (the "Sale-Related Arbitration Provision").

## D.    The Vendor Seeks Extensions.

In December 2023, with the Hawai'i Agreement set to expire at the end of the month, the Vendor proposed extending the agreement by ten years. The Operator said it could not permit a lengthy extension because it was in the middle of negotiating a venue management agreement with the Hawai'i Landlord. The parties agreed to a six-month extension to June 30, 2024.

In January 2024, the Vendor proposed extending the agreement by five years.[13] The Wembley Agreement was not set to expire for another twenty-three months—on November 1, 2025—and the Operator did not respond. In May, the Vendor made a similar proposal for an extension. The Operator again did not respond.

In June 2024, with the Hawai'i Agreement set to expire at the end of the month, the Vendor again proposed extending the agreement by ten years. By that time, the Operator had completed its negotiations with the Hawai'i Landlord. The Operator nevertheless rejected the proposal, and the parties agreed to a six-month extension to December 31, 2024.

## E.    The Sale Closes.

Legends' acquisition of the Operator closed on August 22, 2024. The Sale-Related Arbitration Provision required the parties to resolve any disputes still

---

[13] Dkt. 19, Ex. 13 at 1.

6

outstanding on terms for any extension of a concession agreement within forty-five days after closing, or by October 6. The Operator and the Vendor agreed to extend the negotiation period for the Wembley Agreement until November 20, 2024.[14]

The parties also executed a memorandum of understanding dated October 9, 2024 (the "MOU") that covered Arena Wembley, the Hawai'i Center, and five other venues.[15] The MOU documented the parties' agreement to extend the Wembley Agreement by five years until November 1, 2030, but recited that the amendment would become operative "in accordance with the terms and conditions of the [Master Agreement] (including Articles V and VI)."[16] The MOU also documented the parties' agreement to extend the Hawai'i Agreement by five years until December 31, 2029, but similarly recited that the amendment would become operative "consistent with the terms and conditions of the [Master Agreement] (including Articles V and VI)."[17]

Article III of the Master Agreement governs extensions in the ordinary course of business. Article VI of the Master Agreement governs extensions after a sale of the Operator. The qualifying language in the MOU indicated that the extensions were

---

[14] Dkt. 19, Ex. 4. The Complaint and the documents it incorporates by reference do not indicate whether the Operator and the Vendor agreed to extend the negotiation period for the Hawai'i Agreement.

[15] Dkt. 19, Ex. 3.

[16] *Id.* at 2.

[17] *Id.*

7

agreements in principle, but that the Master Agreement's requirements would still apply.

**F.      The Operator Refuses To Extend The Wembley Agreement.**

The parties prioritized an extension of the Wembley Agreement. At the Operator's request, the Vendor submitted a final proposal for terms for an extension on September 28, 2024. Nearly one month later, the Operator told the Vendor that it had submitted the proposal to the Wembley Landlord. The Wembley Landlord asked for a meeting to discuss the final proposal. The Vendor offered to attend, but the Operator excluded the Vendor.

On November 11, 2024, the Operator and the Vendor agreed to extend the negotiation period for another thirty days so that it would expire on December 20, 2024.[18] Two days later, the Operator told the Vendor that the Wembley Landlord wanted to see the full Wembley Agreement and asked for the Vendor's consent to share it. The Vendor found that concerning, because if the Operator had truly been engaged in discussions with the Wembley Landlord about the extension, then the Wembley Agreement should have been sent over weeks before. The Vendor suggested that it could send the pertinent provisions of the Wembley Agreement to the Wembley Landlord, but the Operator said no. The Operator insisted on continuing to discuss the extension without the Vendor's involvement.

---

[18] Dkt. 19, Ex. 5.

On December 6, 2024, the Operator reported that it was still discussing the final proposal with the Wembley Landlord. The Operator and the Vendor agreed to extend the negotiation period to February 17, 2025.[19]

By letter dated February 14, 2025, the Operator notified the Vendor that it would not extend the Wembley Agreement. The Operator noted that the Master Agreement required the Wembley Landlord's approval and stated that it had been withheld. Accordingly, the Wembley Agreement would expire on November 1, 2025.[20]

Before sending its letter, the Operator had never provided any feedback on the Vendor's final proposal or shared a counteroffer. The letter did not provide any information about the Operator's discussions with the Wembley Landlord.

The Vendor later learned that the Operator sent its letter on the same day it received an email from the Wembley Landlord rejecting an extension. That email stated only that the Wembley Landlord received the "details of the recent [Vendor] proposal to continue . . . services" and did not "think this is an equitable commercial deal."[21] The email also stated, "as you know, we are not happy with service provision."[22] The email did not offer any additional explanation.

---

[19] Dkt. 19, Ex. 6.

[20] Compl. ¶¶ 119–121.

[21] Dkt. 19, Ex. 7 at 1.

[22] *Id.*

9

The Vendor immediately responded to the Operator's letter. The Vendor questioned whether the Operator complied with its obligation to negotiate reasonably and in good faith under the Sale-Related Negotiation Provision and noted that if there were any disputes over terms, then the next step was arbitration. Four days later, the Operator insisted that it complied with the Sale-Related Negotiation Provision. The Operator asserted that the Sale-Related Arbitration Provision only applied to disagreements between the Vendor and the Operator. Because the Wembley Landlord had withheld consent, there was nothing to arbitrate.

Later in February 2025, the Vendor asked the Operator for more information about the Wembley Landlord's refusal. On March 10, the Vendor followed up. On March 14, the Operator responded with a letter describing "service issues" at Arena Wembley, citing audits, performance reviews, and discussions with the Vendor. The letter stated for the first time that the Operator had concerns with the Vendor's services at Arena Wembley. The Complaint contends that the issues were minor concerns that the Vendor had already addressed, not major issues warranting denial of consent for an extension.

## G.    The Operator Refuses To Extend The Hawai'i Agreement.

While the extension process for the Wembley Agreement moved forward, the parties extended the Hawai'i Agreement's expiration date from December 31, 2024 to March 31, 2025. On March 19, 2025, the parties extended the expiration date again until June 30, 2025.

On May 30, 2025, the Operator proposed to extend the Hawai'i Agreement for another year. The Operator reported the Hawai'i Landlord had given it "limited

authority" to extend the Hawai'i Agreement "solely for the purpose of providing temporary continuity of services and operations" before final termination on June 30, 2026.[23]

For the Vendor, that was surprising news. The Vendor responded that the MOU already authorized an extension through December 31, 2029. The Vendor explained its understanding that the short-term extensions were interim steps toward a long-term extension.

On June 12, 2025, the Operator told the Vendor it did not have any right to extend the Hawai'i Agreement because the Master Agreement and MOU were not enforceable from the outset. The Operator also took the position that the Vendor gave up its renewal rights by agreeing to the extension in March. The Operator referenced "service issues" at the Hawai'i Center, citing audits, performance reviews, and discussions with the Vendor.[24] The letter stated for the first time that the Operator had concerns with the Vendor's services at the Hawai'i Center. The Complaint contends that the issues were minor concerns that the Vendor had already addressed, not major issues warranting denial of consent for an extension.

## H.    This Litigation

The Vendor filed this lawsuit on June 13, 2025. The Complaint contains five counts.

---

[23] Compl. ¶ 155.

[24] *Id.* ¶ 158.

Count I asserts that the Operator breached Section 3.2 of the Master Agreement by refusing to permit the Vendor to exercise its right to extend the Wembley Agreement. Count II asserts the same claim regarding the Hawai'i Agreement.[25] Section 3.2 governs extensions in the ordinary course of business in scenarios where no sale of the Operator has occurred.

Count III asserts that the Operator breached the provisions of the Master Agreement that govern extensions after a sale of the Operator has occurred. Count III alleges that the Operator breached those provisions by (i) refusing to permit the Vendor to exercise its right to extend the Wembley Agreement, (ii) failing to comply with the Sale-Related Negotiation and Arbitration Provisions, and (iii) failing to comply with the Further Action Provision. Count IV asserts the same claim regarding the Hawai'i Agreement.

Count V asserts that the Operator breached the implied covenant of good faith and fair dealing inherent in the Master Agreement. It relies on the same conduct as Counts III and IV.

## II.    LEGAL ANALYSIS

The Operator moved to dismiss the Complaint under Rule 12(b)(6). A motion to dismiss under Rule 12(b)(6) tests whether the complaint's allegations state a claim

---

[25] Both counts invoke both Section 3.1 and 3.2. Section 3.1 establishes the Vendor's exclusive right to serve as the concessionaire during the term of the concession agreement. Section 3.2 governs the extension right. This dispute concerns the extension right. The Operator has not taken the position that it would not respect the Vendor's exclusivity right if a valid extension had taken place.

on which relief can be granted. When considering a Rule 12(b)(6) motion, "a trial court should accept all well-pleaded factual allegations in the Complaint as true, accept even vague allegations in the Complaint as 'well-pleaded' if they provide the defendant notice of the claim, [and] draw all reasonable inferences in favor of the plaintiff."[26] The court should "deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[27] "Our governing 'conceivability' standard is more akin to 'possibility,' while the federal 'plausibility' standard falls somewhere beyond mere 'possibility' but short of 'probability.'"[28]

## A.    The Implied Covenant Claim

In Count V of the Complaint, the Vendor contends that the Operator breached the implied covenant of good faith and fair dealing inherent in the Master Agreement. According to the Vendor, the Operator breached the implied covenant by inducing the Wembley Landlord and the Hawai'i Landlord to withhold their consents to extensions. At the pleading stage, this theory states a claim on which relief can be granted.

---

[26] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

[27] *Id.*

[28] *Id.* at 537 n.13.

### 1. The Law Governing An Implied Covenant Claim

As a matter of black-letter law, "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."[29] Delaware law similarly recognizes that an implied covenant of good faith and fair dealing "attaches to every contract."[30] The Delaware Supreme Court has summarized the implied covenant concisely as follows:

> The implied covenant is inherent in all contracts and is used to infer contract terms to handle developments or contractual gaps that . . . neither party anticipated. It applies when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected. The reasonable expectations of the contracting parties are assessed at the time of contracting.[31]

While the Delaware Supreme Court has not provided extensive guidance on what "good faith" and "fair dealing" mean, an implied covenant claim is contractual.[32] That means those terms are contractual concepts. When used with the implied covenant, the term "good faith" does not "envision loyalty to the contractual counterparty, but

---

[29] Restatement (Second) of Contracts § 205 (Am. L. Inst. 1981), Westlaw (database updated Oct. 2024).

[30] *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005).

[31] *Dieckman v. Regency GP LP*, 155 A.3d 358, 367 (Del. 2017) (internal quotation marks omitted).

[32] *Rossdeutscher v. Viacom, Inc.*, 768 A.2d 8, 20 (Del. 2001) ("A breach of the implied covenant is a breach of contract.").

rather faithfulness to the scope, purpose, and terms of the parties' contract."[33] The concept of "fair dealing" refers to "a commitment to deal 'fairly' in the sense of consistently with the terms of the parties' agreement and its purpose."[34]

When analyzing an implied covenant claim, a reviewing court does not introduce its own notions of what is "fair or reasonable under the circumstances."[35] The application of "good faith" and "fair dealing" turns "on the contract itself and what the parties would have agreed upon had the issue arisen when they were bargaining originally."[36]

The Delaware Supreme Court has recognized that the implied covenant can apply in two different settings: (1) when a party invokes the covenant to imply an omitted right or obligation, and (2) when a party invokes the covenant to constrain a counterparty's exercise of contractual discretion.[37] In the first setting, a court determines whether there is a gap in the contract, whether the gap should be filled, and if so, what term the parties would have agreed to if the issue had arisen at the

---

[33] *Gerber v. Enter. Prods. Hldgs., LLC*, 67 A.3d 400, 419 (Del. 2013) (emphasis omitted), *overruled on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808 (Del. 2013).

[34] *Id.*

[35] *Allen v. El Paso Pipeline GP Co., L.L.C.*, 113 A.3d 167, 184 (Del. Ch. 2014), *aff'd*, 2015 WL 803053 (Del. Feb. 26, 2015) (TABLE).

[36] *Id.* (emphasis omitted) (internal quotation marks omitted).

[37] *See Johnson & Johnson v. Fortis Advisors LLC*, 352 A.3d 229, 253 (Del. 2026) (explaining the "two primary ways" that the implied covenant operates).

bargaining table.[38] In the second setting, the discretionary right simplifies the inquiry because it gives rise to the gap. The court need only determine whether the party exercised its discretionary right "reasonably," meaning consistent with the parties' expectations at the time of contracting.[39] This case implicates the first setting.

When determining whether the implied covenant can supply an omitted term, the court initially examines the contract to determine whether a gap exists that the implied covenant could fill. If a gap exists, then the court must determine whether to use the implied covenant to fill it. Not all gaps should be filled. Only if a gap exists and should be filled does the court consider what omitted term should fill the gap. If all three requirements are met, then the court compares the allegedly wrongful

---

[38] *See Calumet Cap. P'rs LLC v. Victory Park Cap. Advisors, LLC*, 353 A.3d 88, 123–25 (Del. Ch. 2026).

[39] *Gerber*, 67 A.3d at 418 (citing *ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC*, 50 A.3d 434, 440–42 (Del. Ch. 2012), *aff'd in part, rev'd in part on other grounds*, 68 A.3d 665 (Del. 2013)); *see also Calumet*, 353 A.3d at 127 ("The principles that govern the implied covenant teach that the exercise of discretionary authority must fall within the range of possibilities that the parties would have agreed to during their original negotiations, if they had thought to address the issue."); *Johnson & Johnson*, 352 A.3d at 253 ("When the party exploits that discretion in a manner that defeats the 'overarching purpose' of the bargain, courts may imply a requirement that such discretion be exercised reasonably and in good faith to ensure that the discretionary power is applied consistently with what reasonable parties would have agreed to at signing."). This temporal limit ensures that the implied covenant is not invoked to "establish a free-floating requirement that a party act in some morally commendable sense." *El Paso Pipeline*, 113 A.3d at 182–83.

conduct against the implied term to determine whether the implied covenant was breached.

### a. Identifying A Gap

When a party claims that the implied covenant should supply a term, the court "first must engage in the process of contract construction to determine whether there is a gap that needs to be filled."[40] "Through this process, a court determines whether the language of the contract expressly covers a particular issue, in which case the implied covenant will not apply, or whether the contract is silent on the subject, revealing a gap that the implied covenant might fill."[41]

The court must start by determining whether a gap exists because "[t]he implied covenant will not infer language that contradicts a clear exercise of an express contractual right."[42] "[B]ecause the implied covenant is, by definition, *implied*, and because it protects the *spirit* of the agreement rather than the form, it cannot be invoked where the contract itself expressly covers the subject at issue."[43]

A court thus cannot determine whether to invoke the implied covenant until after the court has determined what the contract explicitly contemplates. The court

---

[40] *El Paso Pipeline*, 113 A.3d at 183.

[41] *NAMA Hldgs., LLC v. Related WMC LLC*, 2014 WL 6436647, at *16 (Del. Ch. Nov. 17, 2014).

[42] *Nemec v. Shrader*, 991 A.2d 1120, 1127 (Del. 2010).

[43] *Fisk Ventures, LLC v. Segal*, 2008 WL 1961156, at *10 (Del. Ch. May 7, 2008), *aff'd*, 984 A.2d 124 (Del. 2009) (TABLE).

17

starts with the express terms to assess what they cover. If a gap remains, then the court can move to the second step.

### b.      Determining Whether A Gap Should Be Filled

"If a contractual gap exists, then the court must determine whether the implied covenant should be used to supply a term to fill the gap."[44] "Not all gaps should be filled."[45]

One reason a gap might exist is if the parties negotiated over a term and rejected it. Under that scenario, the implied covenant should not be used because doing so would grant a party what they "failed to secure . . . at the bargaining table."[46] A court must not use the implied covenant to "rewrite a contract" that a party "now believes to have been a bad deal."[47] "Parties have a right to enter into good and bad contracts, the law enforces both."[48]

Contractual gaps can also exist for other reasons.[49] One is a desire (or tacit willingness) to have common law principles apply. "Parties negotiate in the shadow

---

[44] *El Paso Pipeline*, 113 A.3d at 183.

[45] *Id.*

[46] *Aspen Advisors LLC v. United Artists Theatre Co.*, 843 A.2d 697, 707 (Del. Ch.) (Strine, V.C.), *aff'd*, 861 A.2d 1251 (Del. 2004).

[47] *Nemec*, 991 A.2d at 1126.

[48] *Id.*

[49] *See generally* Karen Eggleston, Eric A. Posner & Richard Zeckhauser, *The Design and Interpretation of Contracts: Why Complexity Matters*, 95 Nw. U. L. Rev. 91 (2000). In this now-classic work, the authors discuss reasons why parties may favor contractual simplicity over contractual complexity. In their lexicon, complexity

of default principles of law."[50] Thanks to a centuries-long Anglo-American legal tradition, there are a lot of default principles. If a contract is silent, and if the default principles covering that area are well-developed, then those principles presumptively apply.[51] They fill the gap, obviating the need for the court to do so.

Strategic ambiguity can also produce gaps. Parties to a contract who anticipate disagreeing over an issue may opt to leave the issue open or the language ambiguous to preserve their positions for future litigation.[52] Perhaps the issue will not arise, in

---

means carefully spelling out lots of contract terms; simplicity means using a shorter, less-developed contract. For practical purposes, simplicity is synonymous with gaps. Factors that affect the choice between complexity and simplicity include environmental complexity, negotiation costs, asymmetric information, monitoring dynamics, evolutionary pressures and forms, convention, trust and reputation, enforcement costs, bounded rationality, and ease of renegotiation. *Id.* at 132.

[50] *New Enter. Assocs. 14, L.P. v. Rich*, 292 A.3d 112, 138 (Del. Ch. 2023); *see also Reinhard & Kreinberg v. Dow Chem. Co.*, 2008 WL 868108, at *3 (Del. Ch. Mar. 28, 2008) (observing when interpreting the term "defense" that "a reasonable, third-party observer understands that sophisticated parties who are represented by counsel-like those in this dispute-bargain for and draft their agreements under the shadow of established law" such that the established law informs the meaning to be given to the term when parties have not contracted for a different definition).

[51] *New Enter.*, 292 A.3d at 138; *accord Level 4 Yoga, LLC v. CorePower Yoga, LLC*, 2022 WL 601862, at *14 n.150 (Del. Ch. Mar. 1, 2022) (noting that "default common law rules" apply to a contractual relationship and that "contracting parties always bargain in the shadow of the common law, unless they choose expressly to disclaim it"), *aff'd*, 287 A.3d 226 (Del. 2022) (TABLE); *see Arwood v. AW Site Servs., LLC*, 2022 WL 705841, at *31 (Del. Ch. Mar. 9, 2022) (applying principle to hold that "[w]hen parties choose not to (or fail to) allocate the risk of sandbagging in their contract, the buyer may rest on its reasonable belief that it has acquired as part of the transaction the seller's implicit promise to be truthful in its representations").

[52] Claire A. Hill, *Bargaining in the Shadow of the Lawsuit: A Social Norms Theory of Incomplete Contracts*, 34 Del. J. Corp. L. 191, 200 (2009).

which case they have saved the time and effort that would go into working out a compromise.[53] If it does, then the gap or ambiguity "can be viewed as an embedded option, which the party may seek to exercise if future uncertainties play out in a particular way."[54]

Sheer complexity can produce gaps too. Commercial contracts can be long and multi-faceted.[55] Their language can be cumbersome, inartful, or imprecise. Lawyers typically start with a form, usually a precedent from a prior deal. Over time, provisions accumulate—both for good and ill. Some cover issues that arose previously and the agreement now addresses, offering contract-law versions of G.K. Chesterton's

---

[53] *See* Richard A. Posner, *The Law and Economics of Contract Interpretation*, 83 Tex. L. Rev. 1581, 1583 (2005) ("Deliberate ambiguity may be a necessary condition of making the contract; the parties may be unable to agree on certain points yet be content to take their chances on being able to resolve them, with or without judicial intervention, should the need arise."), *cited in United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 845 n.203 (Del. Ch. 2007).

[54] George S. Geis, *An Embedded Options Theory of Indefinite Contracts*, 90 Minn. L. Rev. 1664, 1669 (2006).

[55] *See* Melissa Sawyer, *Merger Agreements are Too Long*, Harv. L. Sch. F. on Corp. Governance (Nov. 28, 2025), https://corpgov.law.harvard.edu/2025/11/28/merger-agreements-are-too-long/; *see also* Steven M. Davidoff & Christina M. Sautter, *Lock-Up Creep*, 38 J. Corp. L. 681 (2013) (discussing the increasing complexity of lockups in merger agreements).

fence.[56] But others may touch on similar issues using different terms or different structures. The resulting interactions and interstices create gaps.[57]

Many contractual gaps result from resource constraints, be they temporal, financial, or cognitive. Contracting is costly, so even the most skilled and sophisticated parties will necessarily leave gaps.[58]

This last source of gaps encounters the Delaware Supreme Court's decision in *Nemec.* There, then-Chief Justice Steele wrote that the implied covenant only applies to "developments that could not be anticipated, not developments that the parties simply failed to consider."[59] In *Johnson & Johnson,* the Delaware Supreme Court reaffirmed that formulation, observing that "hindsight cannot correct oversight."[60]

Read literally, however, the "could not be anticipated" test would be impossible to overcome. With sufficient luck and creativity, virtually *any* future state of the world *could be* anticipated. The problem is not that anticipating a particular future

---

[56] According to Chesterton, "There exists in such a case a certain institution or law; let us say, for the sake of simplicity, a fence or gate erected across a road. The more modern type of reformer goes gaily up to it and says, 'I don't see the use of this; let us clear it away.' To which the more intelligent type of reformer will do well to answer: 'If you don't see the use of it, I certainly won't let you clear it away. Go away and think. Then, when you can come back and tell me that you *do* see the use of it, I may allow you to destroy it.'" G.K. Chesterton, *The Thing* 35 (1929).

[57] *See* Hill, *supra,* at 194–95.

[58] *See Lonergan v. EPE Hldgs., LLC*, 5 A.3d 1008, 1018 (Del. Ch. 2010).

[59] *Nemec*, 991 A.2d at 1126.

[60] *Johnson & Johnson*, 352 A.3d at 255.

state is impossible. The problem is that there are so many future states that parties could anticipate. Not only that, but with the benefit of hindsight, the state of the world that actually arises will seem like a future that not only could, but should have been anticipated. Were "could not be anticipated" truly the law, the implied covenant would have no meaning.

*Johnson & Johnson* makes clear that the implied covenant remains meaningful. As the justices acknowledged in that decision, "[n]o contract, regardless of how tightly or precisely drafted it may be, can wholly account for every possible contingency."[61] That is because "[i]n only a moderately complex or extend[ed] contractual relationship, the cost of attempting to catalog and negotiate with respect to all possible future states of the world would be prohibitive."[62] Consequently, even the most skilled and sophisticated parties will necessarily "fail to address a future state of the world . . . because contracting is costly and human knowledge imperfect."[63] The implied covenant can reach those scenarios, even if they theoretically could have been anticipated by parties with sufficient resources, creativity, and luck.

The "could not be anticipated" test also cannot be literally true because the Delaware Supreme Court has recognized that "parties occasionally have

---

[61] *Id.* at 254 (internal quotation marks omitted).

[62] *Credit Lyonnais Bank Nederland, N.V. v. Pathe Commc'ns Corp.*, 1991 WL 277613, at *23 (Del. Ch. Dec. 30, 1991) (Allen, C.).

[63] *Lonergan*, 5 A.3d at 1018.

22

understandings or expectations that were so fundamental that they did not need to negotiate about those expectations."[64] The justices have explained that "[t]he implied covenant is well-suited to imply contractual terms that are so obvious . . . that the drafter would not have needed to include the conditions as express terms in the agreement."[65] Terms so obvious that both sides implicitly understood them are, necessarily, terms that could have been anticipated. Indeed, they were both anticipated and known, yet the implied covenant can address them because they were so basic that no one would have thought to include them in the agreement.

The "could not be anticipated" formulation thus offers a helpful reminder that courts must not too readily identify a contractual gap, but it cannot be strictly true. Rather, a court considering whether to invoke the implied covenant must assess whether the parties realistically could have addressed the contingency. "Making that assessment in turn requires resisting hindsight's seductive acuity, where knowledge of what actually happened makes the unforeseen seem readily foreseeable."[66] A gap is worth filling when parties could not have realistically addressed it, either because of the circumstances they faced or their implicit understandings.[67]

---

[64] *Dieckman*, 155 A.3d at 368 & n.26 (citing *Katz v. Oak Indus. Inc.*, 508 A.2d 873, 880 (Del. Ch. 1986) (Allen, C.) (quoting *Corbin on Contracts* (Kaufman Supp. 1984), § 570)).

[65] *Id.* at 361.

[66] *Calumet*, 353 A.3d at 125.

[67] *Id.*

### c.     Supplying An Omitted Term

If a gap both exists and should be filled, then the court must supply the omitted term. "The implied covenant seeks to enforce the parties' contractual bargain by implying only those terms that the parties would have agreed to during their original negotiations if they had thought to address them."[68] The plaintiff therefore must show "from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of . . . had they thought to negotiate with respect to that matter."[69] Put differently, the trial court must "analyze[] whether the parties would have bargained for a contractual term proscribing the conduct that allegedly violated the implied covenant had they foreseen the circumstances under which the conduct arose."[70]

When seeking to ascertain what parties would have agreed to when bargaining originally, the analysis recognizes that contract parties join in a cooperative enterprise to create a joint surplus.[71] In other words, parties to a contract are not

---

[68] *Gerber*, 67 A.3d at 418.

[69] *Katz*, 508 A.2d at 880.

[70] *Baldwin v. New Wood Res. LLC*, 283 A.3d 1099, 1118 (Del. 2022).

[71] *See Contrarian Funds L.L.C. v. Westpoint Int'l, Inc.*, C.A. No. 2617-CC, at 6 (Del. Ch. Nov. 3, 2010) (TRANSCRIPT) ("[C]ontracts are entered into for the benefit of all parties to the contract."), *aff'd*, 26 A.3d 213 (Del. 2011); *see also* Restatement (Second) of Contracts, *supra*, § 205 cmt. a ("Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party . . . ."); 1 Williston On Contracts § 1:1 (4th ed.), Westlaw (database updated May 2026) ("Contract law is designed to protect the expectations of the contracting parties. It is intended to enforce the expectancy interests created by the parties' promises so that they can allocate risks

fiduciaries for each other and are therefore free to act in their own interests, but they have nonetheless committed themselves to act together in a joint effort.[72]

Here again, however, the Delaware Supreme Court's admonitions against freewheeling deployment of the implied covenant loom large. Wielding the implied covenant is a "cautious enterprise,"[73] and to imply a term is a "limited and extraordinary legal remedy."[74]

---

and costs during their bargaining. The goal of contract law is to hold parties to their agreements so that they receive the benefits of their bargains."); 17A Am. Jur. 2d Contracts § 362 (2d ed.), Westlaw (database updated May 2026) (under the implied covenant of good faith and fair dealing, "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract"). *See generally* Alan Schwartz & Robert E. Scott, *Contract Theory and the Limits of Contract Law*, 113 Yale L.J. 541, 552–54 (2003) ("Bargaining power . . . is exercised in the division of the surplus . . . . Parties jointly choose the contract terms so as to maximize the surplus . . . .").

[72] *ArchKey Intermediate Hldgs. Inc. v. Mona*, 302 A.3d 975, 1005 (Del. Ch. 2023); *see Libeau v. Fox*, 880 A.2d 1049, 1056–57 (Del. Ch. 2005) (alluding to the "wealth-creating and peace-inducing effects of civil contracts"), *aff'd in part, rev'd in part on other grounds*, 892 A.2d 1068 (Del. 2006). *See* Schwartz & Scott, *supra*, at 544 ("[C]ontract law should facilitate the efforts of contracting parties to maximize the joint gains (the 'contractual surplus') from transactions."); Gerrit De Geest, *N Problems Require N Instruments*, 35 Int'l Rev. L. & Econ. 42, 46 (2013) ("[T]he fundamental goal of contract law [is] to maximize the joint surplus of the parties . . . ."); Jeffrey L. Harrison, *A Case for Loss Sharing*, 56 S. Cal. L. Rev. 573, 594 (1983) ("Partnership law and contract law are both designed to foster the sharing of a jointly created surplus.").

[73] *Nemec*, 991 A.2d at 1125.

[74] *Id.* at 1128.

When, then, should the implied covenant be used? "English law has developed helpful answers that go beyond the current state of Delaware jurisprudence."[75] A leading Privy Council judgment states,

> [F]or a term to be implied, the following conditions (which may overlap) must be satisfied: (1) it must be reasonable and equitable; (2) it must be necessary to give business efficacy to the contract, so that no term will be implied if the contract is effective without it; (3) it must be so obvious that "it goes without saying"; (4) it must be capable of clear expression; [and] (5) it must not contradict any express term of the contract.[76]

On the issue of obviousness, Lord Justice MacKinnon offered a pithy test in a 1939 judgment: "Prima facie that which in any contract is left to be implied and need not be expressed is something so obvious that it goes without saying; so that, if, while the parties were making their bargain, an officious bystander were to suggest some express provision for it in their agreement, they would testily suppress him with a common 'Oh, of course!'"[77]

Thus, under English law, "a term should not be implied into a detailed commercial contract merely because it appears fair or merely because one considers that the parties would have agreed [to] it if it had been suggested to them."[78] The

---

[75] *Guilbeau v. Footprint Int'l Holdco, Inc.*, — A.3d —, —, 2026 WL 1180159, at *14 (Del. Ch. Apr. 30, 2026).

[76] *BP Refinery (Westernport) Pty Ltd v Shire of Hastings* (1977) 180 CLR 266, 282–83.

[77] *Shirlaw v Southern Foundries (1926) Ltd* [1939] 2 KB 206, 227.

[78] *Marks and Spencer plc v BNP Paribas Securities Services Trust Co (Jersey) Ltd* [2015] UKSC 72, [2016] AC 742 [21].

term must also "be so obvious as to go without saying or to be necessary for business efficacy."[79] "The additional requirements limit the court's flexibility in deploying the implied covenant, but using more tractable concepts than Delaware law has yet deployed."[80]

**2.      The Claim For Breach Of The Implied Covenant In The Master Agreement**

The Vendor contends that the Master Agreement contains an implied term preventing the Operator from advocating that a third party withhold its consent to an extension of a concession agreement. It is reasonably conceivable that the Master Agreement implies that term.

The implied covenant analysis starts by asking whether there is a gap that could be filled. The Master Agreement contains a gap: It provides that an extension is "subject in all cases to any applicable third party approvals, public bidding/contractual requirements and similar items as may be applicable with respect to such Venue which are imposed by third parties."[81] The Master Agreement does not address what extent the Operator and the Vendor are involved in obtaining third-party approvals.

Other provisions of the Master Agreement both address third-party approvals and fill that gap. For example, Section 2.1(c) addresses venues that the Operator

---

[79] *Id.* at [23].

[80] *Guilbeau*, 2026 WL 1180159, at *14.

[81] MA § 6.4.

acquires in the future. It provides that the Operator "will use commercially reasonable efforts to obtain necessary third party consents" to enable the Vendor to become the exclusive provider.[82]

The next question is whether the gap should be filled. The Operator argues that other terms in the contract demonstrate that the parties created this gap intentionally and that the court should not fill it. Some sections of the Master Agreement both contemplate third-party consents and impose an obligation on the Operator to use commercially reasonable efforts to obtain the consent.[83] The provision cited in the prior paragraph regarding new venues that the Operator acquires is one example.

The Operator contends that these provisions show that the parties made choices about when to impose an efforts obligation on the Operator. The Operator argues that by remaining silent on the Operator's obligation for purposes of a

---

[82] *Id.* § 2.1(c).

[83] *See id.* (providing that the Operator "shall not be required to take any action that is not within their sole control or discretion, but will use commercially reasonable efforts to obtain necessary third party consents to implement the foregoing"); *id.* § 6.5 (providing that the Operator "agrees to use its good faith efforts (which, for the sake of clarity, shall not require the [Operator] to grant any more than immaterial concessions, make any more than immaterial payments, initiate any legal or arbitration proceedings or otherwise waive or fail to enforce any of its more than immaterial rights against any third party) to obtain an extension of the term . . . subject in all cases to any applicable third party approvals"); *id.* § 3.3(a)(iii) (providing that the Operator "shall use their commercially reasonable efforts to support the selection of [the Vendor] as the foodservice provider at such Major League Venue . . . except . . . where the owner of the applicable Major League Venue or other applicable third party involved in such Major League Venue . . . requests that the [Operator] . . . conduct a public bidding process").

landlord's consent to an extension after a sale of the Operator, the parties intentionally created a gap that allocates the risk of non-consent to the Vendor. The Operator concludes that this inferably intentional gap should not be filled, because it would give the Vendor a right it did not obtain at the bargaining table.

That argument would have force if the Vendor sought an implied term requiring the Operator to use some level of affirmative efforts to obtain the landlords' consent. All of the provisions in the Master Agreement that the Operator points to require affirmative efforts, such as commercially reasonable efforts. But the Vendor does not claim that the Operator had an implied obligation to use affirmative efforts to obtain landlord consent to an extension after a sale. The Vendor maintains only that the Operator had an implied obligation not to intentionally undermine the landlord's willingness to consent, such as by advocating that the landlord withhold its consent.

There are obvious differences between affirmatively helping, standing neutral, and consciously harming.[84] The Vendor seeks only an implied term that prevents consciously harming. That is center-of-the-fairway for the implied covenant, which prevents a party from "frustrating the fruits of the bargain that the asserting party reasonably expected."[85] When a party responds to a gap by claiming that it exists so

---

[84] *See* Martin Luther King, Jr., *Letter from a Birmingham Jail* (Apr. 16, 1963), https://www.africa.upenn.edu/Articles_Gen/Letter_Birmingham.html (describing the degrees of support, non-support, and hostility that civil rights activists encountered and their effects on the success of the movement).

[85] *Dieckman*, 155 A.3d at 367 (internal quotation marks omitted).

that the party can intentionally harm its counterparty, that party—through its own argument—has identified a gap that the implied covenant can and should fill.[86]

Third, the Vendor's proposed term is reasonably conceivable. Framed in terms of the traditional Delaware test, it falls into the category of understandings so foundational that it would be offensive to suggest during a negotiation that the counterparty should be expressly prohibited from violating them. The foundational understanding here is that one side will not secretly attempt to tank the agreement, thereby depriving the other side of the fruit of its bargain. To raise this issue, the Vendor would have needed to say something like, "You seem like a sneaky, deceptive, and greedy bunch, so I just want to make sure you agree that you won't work to defeat and undermine my rights by secretly advocating that a landlord should withhold its consent to an extension or induce them to withhold consent." The Operator would justifiably respond that if the Vendor had such a low opinion of the Operator's trustworthiness, then they shouldn't go into business together in the first place.

Reframed using the English concept of the officious bystander, if someone observing the negotiations had piped up with the suggestion that the parties needed to expressly prohibit the Operator from secretly advocating that a landlord should withhold its consent, the parties would have responded with a common, "Of course

---

[86] Note the predicate requirement for a gap. Many contracts are zero sum, such as derivative contracts between financial institutions. Parties to those contracts agree to specific provisions that enable one side to shift losses to the other or capture gains from the other. That is the point of the contract. The implied covenant does not override express provisions, and it therefore does not override terms of that sort.

that's prohibited! No one would think the Operator could do that!"[87] The understanding that the Operator would not take action to convince a third party to withhold its consent was so foundational that they would not have thought to add that obligation.

The final question is whether it is reasonably conceivable that the Operator breached the omitted term. It is.

The Complaint alleges that after the sale, the Operator's new owners were financially incentivized to replace the Vendor with their own concession operation. But because of the Vendor's extension rights, the Operator's new owners could not easily dislodge the Vendor. So they decided to get rid of the Vendor by convincing the landlords to withhold their consent to extensions. To support that theory, the Vendor cites circumstantial evidence which, in the aggregate, supports a pleading-stage inference that the Operator sought to convince the landlords to withhold their consent.

First, the Operator excluded the Vendor from the discussions with the landlords, despite the Vendor's repeated offers to participate. By controlling the discussions and always speaking privately with the landlords, the Operator's new owners had free reign to say what was necessary to induce the landlords to withhold their consents. By contrast, an Operator that at least tried to remain neutral would

---

[87] *See Guilbeau*, 2026 WL 1180159, at *14 (discussing the officious bystander test).

have arranged a meeting between the Vendor and the landlords or at least consulted with the Vendor about the discussions.

Second, the Operator dragged its feet when presenting the extension proposals to the landlords. After securing the Vendor's final proposal for an extension at Arena Wembley, the Operator waited almost a month before sending it to the Wembley Landlord, then waited another three weeks before raising the possibility of sharing the Wembley Agreement with the Wembley Landlord. The Operator also refused to let the Vendor send the key provisions of the Wembley Agreement to the Wembley Landlord. An Operator that at least remained neutral would have forwarded the Vendor's final proposal promptly, followed up with the Wembley Agreement, and allowed the Vendor to communicate with the Wembley Landlord.

Third, the Operator's letter to the Vendor followed so quickly on the heels of the Wembley Landlord's email to the Operator as to suggest it was the result the Operator wanted and had been trying to secure. The Wembley Landlord's email was hardly a resounding rejection of the Vendor's proposal. It was generalized and without detail. Yet rather than consulting with the Vendor or letting the Vendor respond, the Operator jumped at the opportunity to tell the Vendor that the Wembley Landlord had withheld consent. The timing and contents of the communications support an inference that the Operator was eager to seize upon the email as a basis to deny an extension.

Fourth, the Operator raised inferably pretextual concerns about the Vendor's performance. The Complaint alleges that the Operator never raised any systemic or

serious problems at Arena Wembley or the Hawai'i Center for nearly a decade. The Operator suddenly raised alleged concerns in connection with its refusal to extend the concession agreements, but those assertions lacked support beyond picayune objections. When the Vendor asked for evidence of any major issues, the Operator did not provide any.

Finally, the Operator plans to replace the Vendor at Arena Wembley and the Hawai'i Center with its affiliates. As far as the Vendor is concerned, that was the Operator's goal all along.

### 3. The Theory-Of-The-Pleadings Defense

To argue against the implied covenant claim, the Operator points out that the Vendor cites the same alleged conduct to support its claim for breach of the Further Action Provision. According to the Operator, the Vendor cannot claim that the conduct supports a breach of the implied covenant while at the same time contending that it breaches an explicit provision. As the Operator sees it, the Vendor's invocation of the Further Action Provision concedes that there is no gap to fill. If the Operator agreed that the Vendor stated a claim under the Further Action Provision, then that argument might carry more weight, but the Operator insists that the Vendor cannot state a claim under that provision either. The Operator's theory-of-the-pleadings defense fails under modern pleading doctrine, which permits a party to plead in the alternative.

"Unlike at common law, a party can plead alternative and even inconsistent theories."[88] Breach of contract and implied covenant claims can both survive a motion to dismiss when pled as alternative theories for recovery.[89]

The Operator's argument to the contrary seeks to restore a modern-day version of form pleading. That since-abandoned system developed under English common law. A plaintiff who wished to file suit in the Court of Common Pleas or before the King's Bench "had to purchase a royal writ . . . to authorize the commencement of proceedings."[90] The clerks "kept model writs to be copied as requested by individual plaintiffs."[91] To bring a case, a plaintiff had to use one of the model writs, although in an exceptional case a clerk could issue a new writ if "consonant with reason and

---

[88] *Goldstein v. Denner*, 2022 WL 1797224, at *13 (Del. Ch. June 2, 2022); *accord* Ct. Ch. R. 8(d)(2)–(3) ("A party may set out two or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient. . . . A party may state as many separate claims or defenses as it has, regardless of consistency."). *See also Guilbeau v. Footprint Int'l Holdco, Inc.*, — A.3d —, —, 2026 WL 1329169, at *35–37 (Del. Ch. May 11, 2026) (providing a refresher on pleading doctrine).

[89] *See Trumbull Radiologists, Inc. v. Premier Imaging TRI Hldgs. LLC*, 2021 WL 5577249, at *6 (Del. Super. Nov. 29, 2021) (explaining that "implied covenant claims can be retained and litigated simultaneously and parallel to breach of contract claims as an alternative form of relief"); *e.g.*, *Clean Harbors, Inc. v. Safety–Kleen, Inc.*, 2011 WL 6793718, at *9 (Del. Ch. Dec. 9, 2011) (finding that the alleged facts could support a claim for breach of the implied covenant where an express term required defendant to use its "good faith discretion," but other terms to which the implied covenant might apply were potentially ambiguous as to defendant's obligations).

[90] J.H. Baker, *An Introduction to English Legal History* 49 (2d ed. 1979).

[91] Daniel R. Coquillette, *The Anglo-American Legal Heritage* 151 (2d ed. 2004).

not contrary to the law, provided it has been granted by the King and approved by his council."[92] By 1300, the available writs were largely fixed.[93] If the plaintiff could not find a writ that applied to his situation, then "he was without remedy as far as the two benches (King's Bench and Common Pleas) were concerned."[94]

Over the centuries, jurisdictions updated their approaches to pleading, but the obligation to plead a single route to relief persisted under a concept known as the "theory of the pleadings."[95] As with the common law writs, this doctrine required that a complaint "proceed upon some definite theory, and on that theory the plaintiff must succeed, or not succeed at all."[96] Under those approaches to pleading, "[a]lternative and hypothetical pleading generally was not permitted."[97]

The adoption of the Federal Rules of Civil Procedure abrogated these concepts. Under the federal regime, "the common law forms of action have lost all significance, and it no longer is a basis for objection that the relief sought is inconsistent with the theory of the complaint or that the relief granted was not demanded in the

---

[92] *Id.* (quoting Henry de Bracton, *De Legibus et Consuetudinibus Regni Angliae* [On the Laws and Customs of England], fol. 413b).

[93] *Id.*

[94] *Id.* at 152.

[95] *See* 5 Charles Alan Wright, Arthur R. Miller & A. Benjamin Spencer, *Federal Practice and Procedure* § 1219 (4th ed.), Westlaw (database updated Apr. 2026) [hereinafter Wright & Miller].

[96] *Mescall v. Tully*, 91 Ind. 96, 99 (1883).

[97] 5 Wright & Miller, *supra*, § 1282.

pleadings."[98] Delaware followed suit by adopting civil rules modeled on the federal system in 1948.[99]

For nearly eight decades, Delaware has permitted pleading in the alternative. The Vendor can do it here.

## B.     The Claims For Breach Of The Master Agreement

Turning from the implicit to the explicit, the Complaint asserts that the Operator breached several provisions in the Master Agreement. Only the claims for breach of the provisions that apply after a sale of the Operator survive pleading-stage review.

### 1.     The Law Governing A Breach Of Contract Claim

Delaware law governs the Master Agreement.[100] Under Delaware law, the elements of a claim for breach of contract are "(i) a contractual obligation, (ii) a breach of that obligation by the defendant, and (iii) a causally related injury that warrants a remedy, such as damages or in an appropriate case, specific performance."[101]

No one disputes that the Master Agreement is a valid contract containing binding obligations. Whether the Complaint's allegations state claims against the

---

[98] 4 *id.* § 1044.

[99] Daniel L. Herrmann, *The New Rules of Procedure in Delaware*, 18 F.R.D. 327, 336–37 (1956).

[100] *See* MA § 8.9.

[101] *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, at *47 (Del. Ch. Nov. 30, 2020), *aff'd*, 268 A.3d 198 (Del. 2021).

Operator for breaching those obligations presents questions of contract interpretation.

Under Delaware law, the role of a court when interpreting a contract is "to effectuate the parties' intent."[102] Absent ambiguity, the court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions."[103] "Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning."[104] "Contract language is not ambiguous merely because the parties dispute what it means."[105] "To be ambiguous, a disputed contract term must be fairly or reasonably susceptible to more than one meaning."[106] "Delaware courts

---

[102] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006); *accord Exelon Generation Acqs., LLC v. Deere & Co.*, 176 A.3d 1262, 1267 (Del. 2017) (observing that when interpreting contracts, the court "should focus on the parties' shared expectations at the time they contracted").

[103] *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (internal quotation marks omitted).

[104] *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012); *accord Terrell v. Kiromic Biopharma, Inc.*, 338 A.3d 1272, 1276 (Del. 2025) ("When the contract is clear and unambiguous, [the court] will give effect to the plain-meaning of the contract's terms and provisions unless it appears the parties intended a special meaning." (internal quotation marks omitted)).

[105] *Alta Berkeley*, 41 A.3d at 385; *accord Manti Hldgs., LLC v. Authentix Acq. Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021) ("The parties' steadfast disagreement over interpretation will not, alone, render the contract ambiguous." (internal quotation marks omitted)).

[106] *Alta Berkeley*, 41 A.3d at 385; *see Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992).

will not destroy or twist [contract] language under the guise of construing it."[107] "If a writing is plain and clear on its face, *i.e.*, its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent."[108]

"In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein."[109] The Delaware Supreme Court has also instructed that "[t]he basic business relationship between parties must be understood to give sensible life to any contract."[110] A reasonable reading therefore must be "situated in the commercial context between the parties."[111] But this principle cannot be used to override the plain language of the agreement. "While [Delaware courts] have recognized that contracts should be 'read in full and situated in the commercial context between the parties,' the background

---

[107] *Rhone-Poulenc*, 616 A.2d at 1195.

[108] *City Investing Co. Liquidating Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993).

[109] *E.I. du Pont de Nemours & Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985).

[110] *Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 927 (Del. 2017).

[111] *Id.* at 926–27.

facts cannot be used to alter the language chosen by the parties within the four corners of their agreement."[112]

When ruling on a Rule 12(b)(6) motion, a court cannot resolve contractual ambiguity.[113] Dismissal is proper "only if the defendants' interpretation is the *only* reasonable construction as a matter of law."[114] "If the Plaintiff has offered a reasonable construction of the contract, and that construction supports the claims asserted in the complaint, then the Court must deny the motion to dismiss even if the defendant's construction is also reasonable."[115]

### 2. The Claims For Breach Of Section 3.2

The Complaint first alleges that the Operator breached the Vendor's extension right in Section 3.2 of the Master Agreement by refusing to allow the Vendor to extend

---

[112] *Town of Cheswold v. Cent. Del. Bus. Park*, 188 A.3d 810, 820 (Del. 2018) (quoting *Chi. Bridge*, 166 A.3d at 926–27).

[113] *LGM Hldgs., LLC v. Schurder*, 340 A.3d 1134, 1143–44 (Del. 2025) ("When interpreting a contract on a motion to dismiss, the trial court cannot choose between two differing reasonable interpretations of ambiguous provisions." (internal quotation marks omitted)); *accord Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996) ("On a motion to dismiss for failure to state a claim, a trial court cannot choose between two differing reasonable interpretations of ambiguous documents.").

[114] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 615 (Del. 2003); *accord Caspian Alpha Long Credit Fund, L.P. v. GS Mezzanine P'rs 2006, L.P.*, 93 A.3d 1203, 1205 (Del. 2014).

[115] *Cont'l Auto. Sys., Inc. v. Nokia Corp.*, 2023 WL 1370523, at *19 (Del. Ch. Jan. 31, 2023); *accord Anschutz Corp. v. Brown Robin Cap., LLC*, 2020 WL 3096744, at *9 (Del. Ch. June 11, 2020) ("If the plaintiff has proffered a reasonable construction that supports its allegations of breach, dismissal must be denied.").

the concession agreements. That theory fails to state a claim on which relief can be granted because the right does not apply after a sale of the Operator.

Section 3.2 of the Master Agreement generally grants the Vendor the right to extend the term of the concession agreements by ten years past their scheduled expiration date (the "General Extension Right"). It states:

> As and when the term of each [concession] [a]greement for a[] . . . Controlled Venue expires or becomes eligible for renewal during the Exclusivity Term for such . . . Controlled Venue, [the Vendor] shall have the option to cause the term of such [concession] [a]greement to be extended for an additional ten (10) years past its scheduled expiration date (also, an "Extension Period").[116]

The Vendor could exercise the General Extension Right during the "Exclusivity Term."[117] The term ends upon "a Sale of the [Operator]," defined to mean "the direct or indirect sale of all or substantially all of the assets or equity of the [Operator] to a person that is not an Affiliate of either or both of AEG or Onex (whether by merger, sale, consolidation or any other form of transaction)."[118]

The General Extension Right thus ends when there is a sale of the Operator. Once the General Extension Right has ended, the Vendor's extension rights under

---

[116] MA § 3.2.

[117] *Id.*

[118] *Id.* § 1.2. The term also ends if the Operator "for any reasons, cease[s] to control the determination of the foodservice provider for the applicable Venue (*i.e.*, without any third party approval rights or public bidding requirements or other similar items as may be applicable with respect to any such Venue that are imposed by third parties)." *Id.*

Article VI begin. Those rights expressly apply "[i]n connection with the consummation of a Sale of the [Operator]" (the "Sale-Related Extension Right").[119]

Legends' acquisition of the Operator was a sale of the Operator. But the parties join issue over what phase of the transaction process causes the General Extension Right to end and the Sale-Related Extension Right to begin. The Operator argues that the trigger is when the parties announce a planned sale. The Vendor argues that the trigger is when the sale closes.

The distinction matters in this case because the Vendor made some extension offers after the acquisition agreement was announced, but before the sale closed. But the Vendor did not make any extension offers before the announcement. If announcement is the trigger, then only the Sale-Related Extension Right applies. If closing is the trigger, then both extension rights potentially apply.

The Master Agreement does not address the point in the transaction process at which the General Extension Right ends and the Sale-Related Extension Right begins. Article VI contains a series of provisions, including the Sale-Related Extension Right, that apply to concession agreements "[i]n connection with the

---

[119] *See id.* § 6.4. Article VI contains different extension rights depending on the type of venue. *See id.* § 6.2 (Operator-owned venues); *id.* § 6.3 (specific subset of Controlled Venues); *id.* § 6.4 (Controlled Venues); *id.* § 6.5 (venues other than Controlled Venues subject to Section 6.3 or 6.4). Section 6.4 is the extension right that applies to Arena Wembley and the Hawai'i Center. For simplicity, this decision refers to the Section 6.4 extension right as the Sale-Related Extension Right, because that is the right that applies to this dispute.

consummation of a Sale of the [Operator]."[120] "Consummation" refers to closing. The parties agree on that point.

Other provisions, however, envision the parties taking action in advance of closing. Most notably, the negotiation period changes from one year before the scheduled expiration date of a concession agreement to "instead refer to fifteen (15) days prior to the consummation of a Sale of the [Operator]."[121] If the General Extension Right continued to apply until closing, and the Sale-Related Extension Right only began after closing, then satisfying the pre-closing negotiation requirement would be impossible. Under that reading, the Sale-Related Extension Right would only kick in *after* closing, yet those same provisions mandate that the parties begin negotiating fifteen days *before* closing.

Equally important, a reading in which the Sale-Related Extension Right did not apply until after closing would create an unreasonable situation in which the Vendor could rely on the General Extension Right to effectuate a ten-year extension

_____

[120] *Id.* § 6.1 ("In connection with the consummation of any Sale of the [Operator], the following provisions shall apply with respect to the term of each of the . . . the [concession] [a]greements . . . , as applicable."); *id.* § 6.2 ("In connection with the consummation of a Sale of the [Operator], AEG hereby agrees, on behalf of itself and its Affiliates, to extend the term . . . ."); *id.* § 6.3 ("In connection with the consummation of a Sale of the [Operator], the [Operator] hereby agrees, on behalf of itself and its Subsidiaries, to extend the term . . . ."); *id.* § 6.4 ("In connection with the consummation of a Sale of the [Operator], the [Operator] hereby agrees, on behalf of itself and its Subsidiaries, to extend the term . . . ."); *id.* § 6.5 ("In connection with the consummation of a Sale of the [Operator], the [Operator] hereby agrees to use its good faith efforts . . . to obtain an extension of the term . . . .").

[121] *Id.* § 6.6.

up to the moment before closing, without any need to obtain landlord consent. That makes little commercial sense, because a reading of the Master Agreement as a whole demonstrates that the parties intended for a sale of the Operator to trigger the different Sale-Related Extension Right so that landlords could withhold consent if they had concerns about the Operator's new owners.

Another provision involving the Sale-Related Extension Right states that notwithstanding that right, the Operator can reject an extension if it "reasonably determines that such extension would reasonably be expected to adversely affect . . . the valuation of the [Operator] obtainable in such Sale of the [Operator]."[122] Allowing the Operator to reject an extension after closing would not help the Operator secure greater value in the sale. At that point, the deal would have closed, and it would be too late to renegotiate. That provision suggests not only that the Sale-Related Extension Right kicks in before closing, but that it also must kick in *before signing*, because the price is generally set at that point.

Humans are not good at predicting the future. That means humans also struggle with creating foolproof, future-oriented transactional procedures. The Sale-Related Extension Right is an example of an imperfect effort, but the provisions are clear enough to reject as a matter of law a reading under which the Sale-Related Extension Right applies only after closing.

---

[122] *Id.* § 6.4.

The Operator argues for the trigger being the sale announcement, and that seems like the latest possible point in the transaction process at which the regime for the Sale-Related Extension Right could kick in. In an ultra-simplified, even simplistic model of a standard sale process, a seller negotiates with potential buyers, signs up a deal with its chosen buyer, announces the deal, then closes the deal. A seller might announce a sale process before negotiating with potential buyers, but a seller rarely announces a deal until a signed deal actually exists.

The provision authorizing the Operator to reject extensions that could impair value suggests that the regime for the Sale-Related Extension Right could apply before signing. By arguing for the announcement date, the Operator has chosen a date that is later and more favorable to the Vendor than what the Master Agreement inferably contemplates.

That concession is understandable, because otherwise the Master Agreement is ambiguous on this point. It would take a lot of time and effort to determine when the regime governing the Sale-Related Extension Right kicks in, particularly since it seems to contemplate a pre-signing date. By endorsing the announcement as the date, the Operator has chosen a less favorable date for itself. That concession will bind the Operator as a judicial admission.

The Vendor objects that this reading could enable the Operator to announce a sale strategically to terminate the Vendor's General Extension Right and shift into the Sale-Related Extension Right. If the Operator announced a sale unconnected to

44

any sale process, then the Vendor would likely have a claim for breach. That is not this case.

It is not reasonably conceivable that the General Extension Right applies on the pled facts. Counts I and II are dismissed.

### 3.     The Claims For Breach Of The Sale-Related Extension Right

The Complaint alleges that if the regime governing the Sale-Related Extension Right applies, then the Operator breached the Further Action Provision, the Sale-Related Extension Right, and the Sale-Related Negotiation and Arbitration Provisions. Those theories state claims on which relief can be granted.

### a.     The Claim For Breach Of The Further Action Provision

The Complaint alleges that the Operator breached the Further Action Provision, which generally required the parties to "take . . . further actions" that "may be necessary, proper or advisable" to "effectuate" the transactions contemplated by the Master Agreement. The Vendor alleges that the Operator breached the provision by failing to try to obtain the landlords' consent and instead dissuading the landlords from consenting. That theory states a claim on which relief can be granted.

The Further Action Provision states:

Subject to the terms and conditions provided in this Agreement, following the date hereof each of the parties shall, as and when requested by another party hereto, execute and deliver, or cause to be executed and delivered, such further certificates, instruments and other documents, and to take, or cause to be taken, such further actions, as

45

may be necessary, proper or advisable under applicable law to evidence and effectuate the transactions contemplated by this Agreement.[123]

Under this provision, each side must "take . . . further actions" to accomplish a shared contractual goal: "to evidence and effectuate the transactions contemplated by [the Master] Agreement." The obligation is subject to one limiting principle: Each party is only required to take further actions "as may be necessary, proper or advisable under applicable law."

The Further Action Provision is a further assurances provision, which is "a standard provision that commonly appears in commercial agreements."[124] Commentators explain that the provision "aim[s] to fill any contractual gaps by requiring each party to take additional non-specified actions that implement the

_____

[123] *Id.* § 7.1.

[124] *Hawkins v. Daniel*, 273 A.3d 792, 828 (Del. Ch. 2022), *aff'd*, 289 A.3d 631 (Del. 2023). *See Neurvana Med., LLC v. Balt USA, LLC*, 2020 WL 949917, at *4 (Del. Ch. Feb. 27, 2020) (discussing further assurances provision requiring the parties, on request, to "take, or cause to be taken, all such further or other actions as a Party may reasonably deem necessary or desirable in order to carry out the intent and accomplish the purposes of this Agreement"); *Liberty Prop. L.P. v. 25 Mass. Ave. Prop. LLC*, 2009 WL 224904, at *6–7 (Del. Ch. Jan. 22, 2009) (characterizing a provision requiring the parties "to take or cause to be taken all such other and further actions as any of them may reasonably request in order to effect the transactions contemplated" as a "fairly standard" further assurances provision), *aff'd sub nom. 25 Mass. Ave. Prop. LLC v. Liberty Prop. Ltd. P'ship*, 970 A.2d 258 (Del. 2009) (TABLE); *see also* ABA Mergers & Acqs. Comm., *Model Merger Agreement for the Acquisition of a Public Company* 413 (2011) (providing model further assurances provision for stockholder voting agreement; "Stockholder agrees . . . to take such other actions as may be reasonably requested by Parent to evidence or reflect the transactions contemplated by this Agreement and to carry out the intent and purpose of this Agreement.").

overall intent of the contract."[125] Delaware courts agree. One decision describes further assurances provisions as "'catchall contract provision[s] by which a party, after making a precise commitment to perform in some manner, makes a vague, more general commitment to take other actions that are incidental to, and necessary for, the performance of the core commitment.'"[126] In the context of a transaction agreement that contemplated a closing, this court described a further assurances provision as a "covenant imposing affirmative obligations on the parties to take actions toward closing transactions that are specifically addressed in the [transaction agreement]."[127] Framed more generally, a further assurances provision is a covenant imposing an affirmative obligation on the parties to take actions toward achieving outcomes that are specifically addressed in the agreement.

---

[125] Practical Law Commercial Transactions, General Contract Clauses: Further Assurances, Westlaw (database updated 2026); *see id.* ("Commercial contracts rarely specify every single act that each party must take to fully carry out the parties' intended objectives under the agreement. While a general obligation to carry out certain acts may be implied . . . including under the implied covenant . . . , it is preferable for parties and for courts to rely on express contractual provisions."); Practical Law Commercial Transactions, Boilerplate Clauses Overview, Westlaw (database updated 2026) ("A further assurances clause requires the parties to cooperate with one another to carry out the intent of the agreement or implement its provisions, often by taking actions not expressly stated in the agreement.").

[126] *Lighthouse Behav. Health Sols., LLC v. Milestone Addiction Counseling, LLC*, 2023 WL 3486671, at *8 (Del. Ch. May 17, 2023) (alteration in original) (quoting *True N. Commc'ns Inc. v. Publicis S.A.*, 711 A.2d 34, 39 (Del. Ch. 1997)).

[127] *Liberty Prop.*, 2009 WL 224904, at *6; *see Davis v. Yageo Corp.*, 481 F.3d 661, 676 n.10 (9th Cir. 2007) (observing that a further assurances provision does not affect transactions that are not part of the agreement).

That framing in turn points to a limitation on further assurances provisions. They cannot "be used to create new contractual commitments or to resolve ambiguities."[128] The provision is "a mechanism for confirming existing rights and obligations," not a "vehicle for manufacturing new ones."[129] This limitation does not render a further assurances provision meaningless. A court strives to give meaning to every term in an agreement.[130] To give meaning to a further assurances provision,

---

[128] *Hawkins*, 273 A.3d at 829 (discussing an "additional documents" provision, which the court likens to a further assurances provision); *accord Lighthouse*, 2023 WL 3486671, at *8 (rejecting argument that further assurances provision "impose[d] a new obligation on [one party] to obtain patient consents, particularly given that [an express term] imposed that obligation on [the other party]"). *See also* Practical Law Commercial Transactions, General Contract Clauses: Further Assurances, *supra* ("These provisions do not expand the scope of the parties' obligations but are limited to the types of omissions which, if unremedied, would change the way the agreement was intended to work.").

[129] *Hawkins*, 273 A.3d at 829.

[130] *NAMA Hldgs., LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 419 (Del. Ch. 2007) ("Contractual interpretation operates under the assumption that the parties never include superfluous verbiage in their agreement, and that each word should be given meaning and effect by the court."), *aff'd*, 945 A.2d 594 (Del. 2008) (TABLE); *Majkowski v. Am. Imaging Mgmt. Servs., LLC*, 913 A.2d 572, 588 (Del. Ch. 2006) (explaining that courts "attempt to interpret each word or phrase in a contract to have an independent meaning so as to avoid rendering contractual language mere surplusage"). *See Star Am. Rail HoldCo, LLC v. Cathcart*, 2024 WL 5239938, at *9 (Del. Ch. Dec. 17, 2024) (adopting as the only reasonable interpretation of a contract the reading that "gives meaning and effect to each of the contract's terms"). *See generally* Restatement (Second) of Contracts, *supra*, § 203 ("In the interpretation of a promise or agreement or a term thereof, the following standards of preference are generally applicable: (a) an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect . . . ."); *id.* § 203 cmt. b ("Since an agreement is interpreted as a whole, it is assumed in the first instance that no part of it is superfluous.").

the court must determine what additional, otherwise unspecified actions a contract requires to achieve the parties' explicit rights and obligations.[131]

A further assurances provision thus operates as a version of the implied covenant that, unlike the covenant itself, requires some level of affirmative efforts.

> A further assurances provision is the exclamation point on the parties' agreement. In the other parts of the agreement, the parties define their mutual objectives and detail their specific commitments to each other. By contrast, a further assurances provision is a general provision designed to require the parties to exercise a certain degree of effort to achieve the agreement's overall objectives. It recognizes that parties do not and cannot contemplate and draft for every contingency. Thus, the further assurances provision serves as a gap filler and a back stop.[132]

Of course, parties can agree specifically to efforts provisions that ostensibly require a level of efforts to achieve a particular contractual outcome. Efforts provisions "mitigate the rule of strict liability for contractual non-performance that otherwise governs."[133] "Generally speaking, '[i]f a party agrees to do something, he must do it

---

[131] *See, e.g.*, *Mogo, Inc. v. Cricket Media, Inc.*, 2026 WL 540729, at *3–5 (Del. Super. Feb. 26, 2026) (denying motion to dismiss claim for breach of further assurances provision requiring the noteholder to "take such further action as [the collateral agent for the noteholders] shall reasonably request . . . to give effect to [the purchase agreement] and carry out the transactions contemplated hereby" where noteholder allegedly refused to provide information to the collateral agent). *See also* Practical Law Commercial Transactions, Boilerplate Clauses Overview, *supra* ("Further assurances clauses typically involve administrative or other routine matters such as: Providing information. Obtaining consents and approvals. Executing and delivering documents, including ancillary documents to the main transaction. Making government filings.").

[132] Tina L. Stark, *Negotiating and Drafting Contract Boilerplate* 607 (2003).

[133] *Akorn, Inc. v. Fresenius Kabi AG*, 2018 WL 4719347, at *86 (Del. Ch. Oct. 1, 2018), *aff'd*, 198 A.3d 724 (Del. 2018) (TABLE).

or be liable for resulting damages' (or potentially be subject to an order compelling specific performance)."[134] "At times, however, a party's ability to perform its obligations depends on others or may be hindered by events beyond the party's control."[135] In those situations, drafters commonly add an efforts provision to define the level of effort that the party must deploy to attempt to achieve the outcome,[136] and the efforts standard specifies how hard the parties have to try.[137] Commonly used standards include "best efforts," "reasonable best efforts," "reasonable efforts," "commercially reasonable efforts," and "good faith efforts."[138] The parties have not

---

[134] *Id.* (alteration in original) (quoting Lou R. Kling & Eileen T. Nugent, *Negotiated Acquisitions of Companies, Subsidiaries and Divisions* § 13.06, at 13-44 (2018 ed.)).

[135] *Id.* (citing ABA Mergers & Acqs. Comm., *Model Stock Purchase Agreement with Commentary* 212 (2d ed. 2010) ("An absolute duty to perform covenants or similar obligations relating to future actions will often be inappropriate or otherwise not acceptable to one or more parties to the agreement, as, for instance, when a party's ability to perform depends upon events or third-party acts beyond that party's control. In such circumstances, parties typically insert 'efforts' provisions.")); *see also id.* ("[P]arties will generally bind themselves to achieve specified results with respect to activities that are within their control . . . and reserve [an efforts] standard for things outside of their control or those dependent upon the actions of third parties." (second alteration in original) (quoting Kling & Nugent, *supra*, § 13.06, at 13-44)).

[136] *See Model Stock Purchase Agreement with Commentary*, *supra*, at 212 ("'Efforts' clauses are commonly used to qualify the level of effort required in order to satisfy an applicable covenant or obligation.").

[137] *Akorn*, 2018 WL 4719347, at *86.

[138] *See id.* at *86–88 (discussing how the ABA Committee on Mergers and Acquisitions ascribes meaning to various efforts provisions); *AB Stable*, 2020 WL 7024929, at *91 (same).

briefed the potential overlap between a further assurances provision and an efforts provision, and this decision need not engage with that law at the pleading stage.

Here, the Further Action Provision requires the parties to take "further actions." The word "further" indicates that the parties may be required to take some additional, affirmative action that is not already described in the Master Agreement. Under the Master Agreement, extensions of concession agreements are "transactions contemplated by this Agreement."[139] That means the Operator was required to "take . . . further actions, as may be necessary, proper or advisable under applicable law to evidence and effectuate" extensions, including under the Sale-Related Extension Right.

The concepts of "evidence and effectuate" are distinct. The verb form of "evidence" means "to offer evidence of: prove, evince."[140] "Effectuate" means "to cause or bring about (something): to put (something) into effect or operation."[141] Here, the

---

[139] MA § 7.1.

[140] *Evidence*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/evidence; *accord Evidence*, Oxford's Advanced Learner's Dictionary, https://www.oxfordlearnersdictionaries.com/definition/english/evidence_2 ("to prove or show something; to be evidence of something"); *Evidence*, Am. Heritage Dictionary of the English Language, https://ahdictionary.com/word/search.html?q=evidence ("To indicate clearly; exemplify or prove"). Black's Law Dictionary does not have an entry for the verb form of "evidence."

[141] *Effectuate*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/effectuate; *accord Effectuate*, Oxford's Advanced Learner's Dictionary, https://www.oxfordlearnersdictionaries.com/definition/english/effectuate?q=effectuate ("to make something happen"); *Effectuate*, Am. Heritage Dictionary of the English

51

operative verb is effectuate. The Further Action Provision required that the Operator make some effort to effectuate an extension, including under the Sale-Related Extension Right.

Helping to bring about a transaction is synonymous with providing some level of support. This court has found that where a contract obligated a party to take action "in support of the transaction," the term at a minimum required the party "not to take action designed to obstruct" the transaction and instead provide support for the transaction "in the customary manner."[142] Elaborating on the concept of "support" as prohibiting harm, the court explained: "Without listing every action that it might require a party to affirmatively undertake, it is a term ordinarily understood in the English language as incompatible with the launching of a hostile tender offer conditioned on abandonment or destruction" of the transaction.[143]

Here, an obligation to "take, or cause to be taken, such further actions, as may be necessary, proper or advisable under applicable law to . . . effectuate the transactions contemplated by this Agreement" required that the Operator provided some level of support for the Vendor in obtaining landlord consent for its extension request. The Further Action Provision did not permit the Operator to seek to convince or induce a landlord to withhold its consent.

---

Language, https://ahdictionary.com/word/search.html?q=effectuate ("To bring about; effect."). Black's Law Dictionary does not have an entry for "effectuate."

[142] *True N. Commc'ns Inc.*, 711 A.2d at 40–41.

[143] *Id.* at 40.

For the same reasons that it is reasonably conceivable that the Vendor breached the implied covenant, it is reasonably conceivable that the Vendor breached the Further Action Provision. The former only required neutrality and non-harm, yet the Complaint supports an inference that the Operator breached that obligation by engaging in harmful conduct. The Further Action Provision requires affirmative support, so the same alleged conduct supports a breach of that provision.

> **b.** **The Claim For Breach Of The Sale-Related Extension Right**

The Complaint separately alleges that the Operator breached the Vendor's Sale-Related Extension Right. That provision is the contractual driver that actuates the claims for breach of the implied covenant and the Further Action Provision. As a practical matter, the Operator relies more heavily on the Sale-Related Extension Right than the Vendor because the Operator claims the Landlord Consent Requirement operates as a complete defense. That is not accurate.

The Sale-Related Extension Right states:

> In connection with the consummation of a Sale of the [Operator], the [Operator] hereby agrees, on behalf of itself and its Subsidiaries, to extend the term of the [concession] [a]greement for each . . . Controlled Venue . . . for the greater of (a) an additional five (5) years following the expiration of the then remaining term of such [concession] [a]greement for such . . . Controlled Venue or (b) such additional time period as would be required for such [concession] [a]greement for such . . . Controlled Venue to have had an aggregate term of ten (10) years from the date of this Agreement upon expiration, subject in all cases to any applicable third party approvals, public bidding/contractual requirements and similar items as may be applicable with respect to such Venue which are imposed by third parties, unless the [Operator] reasonably determines that such extension would reasonably be expected to adversely affect (i) the valuation of the [Operator] obtainable in such Sale of the [Operator] or (ii) the ongoing business relationship between the [Operator] (or such

53

Subsidiary) and the owner of such Venue or other applicable third party involved in such Venue (*e.g.*, the sports anchor tenant).[144]

The Operator argues that because the landlords withheld consent, the Landlord Consent Requirement was not satisfied, so the Operator had no duty to agree to any extensions and could not breach the Sale-Related Extension Right.

As a general matter, "[p]erformance of a duty subject to a condition cannot become due unless the condition occurs or its non-occurrence is excused."[145] But the prevention doctrine modifies that rule.[146] "Where a party's breach by non-performance contributes materially to the non-occurrence of a condition of one of his duties, the non-occurrence is excused."[147]

---

[144] MA § 6.4.

[145] Restatement (Second) of Contracts, *supra*, § 225(1); *accord id.* § 235 cmt. b.

[146] *See In re Anthem-Cigna Merger Litig.*, 2020 WL 5106556, at *90 (Del. Ch. Aug. 31, 2020), *aff'd sub nom. Cigna Corp. v. Anthem, Inc.*, 251 A.3d 1015 (Del. 2021); *see also Snow Phipps Gp., LLC v. KCAKE Acq., Inc.*, 2021 WL 1714202, at *53 (Del. Ch. Apr. 30, 2021).

[147] Restatement (Second) of Contracts, *supra*, § 245; *accord BitGo Hldgs., Inc. v. Galaxy Digit. Hldgs., Ltd.*, 319 A.3d 310, 333 (Del. 2024) ("[T]he 'prevention doctrine' provides that a party may not escape contractual liability by reliance upon the failure of a condition precedent where the party wrongfully prevented performance of that condition precedent." (internal quotation marks omitted)); *Mobile Commc'ns Corp. of Am. v. MCI Commc'ns Corp.*, 1985 WL 11574, at *4 (Del. Ch. Aug. 27, 1985) ("[A] party may not escape contractual liability by reliance upon the failure of a condition precedent where the party wrongfully prevented performance of that condition precedent."); 13 Williston on Contracts, *supra*, § 39:3 ("When a promisor prevents, hinders, or renders impossible the occurrence of a condition precedent to its promise to perform, or to the performance of a return promise, the promisor is not relieved of the obligation to perform and may not legally terminate the contract for nonperformance." (footnote omitted)); 10 Corbin on Contracts § 53.5, LexisNexis (database updated 2026) ("[C]ourts have long recognized the implied promise not to prevent or hinder the other party's performance of the contract. . . . [T]he doctrine of

To establish that a party's breach contributed materially to the non-occurrence of a condition, "it is not necessary to show that [the condition] would have occurred but for the lack of cooperation. It is only required that the breach have contributed materially to the non-occurrence."[148] "A breach 'contributed materially' to the non-occurrence of a condition if the conduct made satisfaction of the condition 'less likely.'"[149] But "if it can be shown that the condition would not have occurred regardless of the lack of cooperation, the failure of performance did not contribute materially to its non-occurrence and the rule does not apply. The burden of showing this is properly thrown on the party in breach."[150]

"[I]f the non-breaching party proves by a preponderance of the evidence that the breach contributed materially to the failure of the condition by making its satisfaction less likely, then the non-occurrence is excused, and the breaching parties'

---

'prevention' stands for the general proposition that a party cannot rely on the failure of another to perform a condition precedent where he has frustrated or prevented the occurrence of the condition."); 17B C.J.S. Contracts § 769, Westlaw (database updated Apr. 2026) ("When one party prevents the other party's performance of a term of a contract, it excuses the nonperformance and provides a defense in a suit for breach by the nonperformance.").

[148] Restatement (Second) of Contracts, *supra*, § 245 cmt. b.

[149] *Anthem-Cigna*, 2020 WL 5106556, at *90 (quoting *WaveDivision Hldgs., LLC v. Millennium Digit. Media Sys., L.L.C.*, 2010 WL 3706624, at *14, *18 (Del. Ch. Sept. 17, 2010)).

[150] Restatement (Second) of Contracts, *supra*, § 245 cmt. b.

obligations were due even if the condition was not satisfied."[151] "In those circumstances, the breaching party is liable for the failure to perform its obligations."[152] "When the non-occurrence of a condition of a duty is excused . . . the obligor is liable for the same damages for which he would have been liable had the duty originally been unconditional."[153] "But if the breaching party proves by a preponderance of the evidence that its breach could not have contributed materially to the non-occurrence of the condition because the condition would have failed regardless, then the breaching party is not liable in damages."[154]

The prevention doctrine only applies where the breaching party's lack of cooperation in satisfying the condition "constitutes a breach, either of a duty imposed by the terms of the agreement itself or of a duty imposed by a term supplied by the court."[155] The *Restatement (Second) of Contracts* includes helpful illustrations of the

---

[151] *Anthem-Cigna*, 2020 WL 5106556, at *91 (citing Restatement (Second) of Contracts, *supra*, §§ 225(1), 245).

[152] *Id.* (citing Restatement (Second) of Contracts, *supra*, §§ 235, 346).

[153] Restatement (Second) of Contracts, *supra*, § 225 cmt. c.

[154] *Anthem-Cigna*, 2020 WL 5106556, at *91 (citing Restatement (Second) of Contracts, *supra*, § 225 cmt. c).

[155] Restatement (Second) of Contracts, *supra*, § 245 cmt. a. *See, e.g., Snow Phipps*, 2021 WL 1714202, at *2 ("Applying the prevention doctrine, this decision deems the debt financing condition met because the buyers contributed materially to lack of debt financing by breaching their reasonable-best-efforts obligation."); *Murphy Marine Servs. of Del., Inc. v. GT USA Wilm., LLC*, 2022 WL 4296495, at *12 & n.139 (Del. Ch. Sept. 19, 2022) ("GT materially contributed to KPMG not reaching a final valuation decision when it instructed KPMG to stop work and insisted that any further work product address privatization. If GT's performance was conditioned upon KPMG issuing a formal valuation, GT was obliged not to interfere with the

prevention doctrine at work. One illustration shows how the failure of a condition can

be excused, resulting in liability for the party whose conduct made the satisfaction of

the condition materially less likely:

> A contracts to sell and B to buy A's rights as one of three lessees under a mining lease in Indian lands. The contract states that it is "subject only to approval by the Secretary of the Interior," which is required by statute. B files a request for approval but A fails to support B's request by giving necessary cooperation. Approval is denied and A cannot convey his rights. B has a claim against A for total breach of contract. A's breach of his duty of good faith and fair dealing contributed materially to the non-occurrence of the condition, approval by the Secretary of the Interior, excusing it.[156]

A later illustration shows how a party can avoid liability, despite having made the

satisfaction of the condition less likely:

> The facts being otherwise as stated in Illustration 4, A shows that even if he had given his cooperation, the Secretary of the Interior would have withheld approval on other grounds. B has no claim against A for breach of contract. A's breach of his duty of good faith and fair dealing did not contribute materially to the non-occurrence of the condition, and its non-occurrence is not excused.[157]

---

exercise of KPMG's discretion in reaching that valuation—particularly by injecting port privatization into the analysis, which the [binding letter agreement] forbade. . . . At the very least, the [binding letter agreement] includes an implied term requiring the parties to act in good faith and not deliberately or unreasonably prevent KPMG from formalizing its valuation." (footnote omitted)); *Monica v. Delta Data Software, Inc.*, 2026 WL 370756, at *9 (Del. Super. Feb. 10, 2026) ("The complaint . . . pleads that conduct breached the implied covenant, which is sufficient to trigger the prevention doctrine.").

[156] Restatement (Second) of Contracts, *supra*, § 245 cmt. a, illus. 4.

[157] *Id.* § 245 cmt. b, illus. 7.

Avoiding liability thus requires a showing that even if the breaching party "had given his cooperation," i.e., fulfilled its contractual obligations, the condition nevertheless would have failed "on other grounds."

The Vendor alleges the Operator contributed materially to the failure of the Landlord Consent Requirement by convincing or inducing the landlords to withhold consent. The prevention doctrine applies only if the Operator's lack of cooperation in satisfying the Landlord Consent Requirement was a breach of duty. At least at the pleading stage, the Operator's obligation to cooperate flows from the Further Action Provision, which is a duty "imposed by the terms of the agreement itself," or the implied covenant, which is "a duty imposed by a term supplied by the court." In either case, the Operator could not seek to convince or induce the landlords to withhold consent.

The Complaint adequately alleges that the Operator's breach contributed materially to the non-occurrence of the Landlord Consent Requirement. That analysis tracks the reasoning that supports the claims for breach of the implied covenant and Further Action Provision, which this decision need not repeat.

The Operator might still prevail if the landlords would have refused to consent regardless of the Operator's lack of cooperation. That issue is an affirmative defense that cannot be addressed at the pleading stage.

As with its response to the claim for breach of the implied covenant, the Operator argues that the Sale-Related Extension Right placed the risk of a landlord withholding consent on the Vendor, implicating the assumption-of-risk exception to

the prevention doctrine. That exception provides that "there is no prevention claim where the contract, in effect, authorizes prevention."[158] "The essential inquiry is whether or not the contract allocated the risk of the condition's nonoccurrence."[159] "[W]here assumption of risk is found in a contract, courts caution that the specific risk assumed must be distinguished from some 'blanket' assumption of risk claimed. For only a specific risk clearly assumed by a party will preclude that party's defensive claim of prevention. And absent clear contractual authorization of prevention . . . , a court won't judicially imply such a term."[160]

The Operator contends that under Delaware law, the assumption-of-risk exception applies whenever a contract subjects a right to a third party's decision. That contention is inaccurate. Delaware's formulation of the prevention doctrine follows the *Restatement*.[161] The *Restatement* illustration discussed above demonstrates that

---

[158] *Bobcat N. Am., LLC v. Inland Waste Hldgs., LLC*, 2019 WL 1877400, at *6 (Del. Super. Apr. 26, 2019) (internal quotation marks omitted); *accord* 17B C.J.S. Contracts, *supra*, § 769 ("The prevention doctrine has no application when the hindrance is due to some action of the promisor which he or she was permitted to take under either the express or implied terms of the contract.").

[159] *Bobcat*, 2019 WL 1877400, at *6; *accord* Restatement (Second) of Contracts, *supra*, § 245 cmt. a ("There is no breach if the risk of such a lack of cooperation was assumed by the other party or if the lack of cooperation is justifiable.").

[160] *Bobcat*, 2019 WL 1877400, at *8 (footnotes omitted).

[161] *See Snow Phipps*, 2021 WL 1714202, at *53 (explaining that the *Restatement (Second) of Contracts* "supplies the basis for Delaware's formulation of the prevention doctrine").

the prevention doctrine can apply even when a contract subjects a right to a third party's decision.

Nor do the Operator's three cases support its assertion. *Bobcat* involved an agreement to buy a waste management business. If the business failed to meet financial performance targets tied to expanded services, then the buyer could redeem rollover equity granted to the seller. When the business fell short of the targets, the seller sought to defeat the redemption by blaming the poor performance on the buyer and invoking the prevention doctrine. Ruling on summary judgment and not on a motion to dismiss, the court found that the assumption-of-risk exception applied because the agreement "explicitly provide[d]" that if the expansion did not occur, the rollover equity "will automatically and without further deed or action by any party be cancelled and redeemed by [Bobcat]."[162] The court interpreted the word "automatically" as equivalent to "for any reason whatsoever" or "regardless of the circumstances giving rise to such condition."[163]

*Humanigen* involved an agreement between Savant and Humanigen to pursue FDA approval for a drug using Savant's proprietary data.[164] Humanigen argued that once a competitor obtained FDA approval for its own drug, Humanigen no longer owed any obligation to help develop Savant's drug. Savant invoked the prevention

---

[162] *Id.* at *8 (emphasis omitted).

[163] *Id.*

[164] *See Humanigen, Inc. v. Savant Neglected Diseases, LLC*, 2021 WL 4344172 (Del. Super. Sept. 23, 2021).

60

doctrine, arguing that Humanigen's failure to perform prevented Savant from achieving milestones and receiving associated payments. Ruling on summary judgment and not on a motion to dismiss, the court applied the assumption-of-risk exception. Relying on *Bobcat*, the court reasoned that the agreement "contemplated a risk of nonoccurrence" by making the milestones conditional and that as "sophisticated operators in this industry, they know FDA approval is a risk assumed, triggering an exception to the prevention doctrine."[165]

*Chordia* reached a different outcome.[166] That case involved a stockholders' agreement that contained a director designation right conditioned on the founders serving as officers or employees. The stockholder had broad discretion to terminate officers at will. The stockholder fired the officers to eliminate the director designation right. Ruling after trial and not on a motion to dismiss, the court applied the prevention doctrine and rejected the application of the assumption-of-risk exception because the agreement did not give the stockholder "unfettered discretion."[167]

All three cases are distinguishable. Most obviously, none are pleading-stage decisions. All were rendered after discovery, and one after trial.

None of the cases stands for a rule that the assumption-of-risk exception applies whenever a right is conditioned on third-party consent. There is broad

---

[165] *Id.* at *13.

[166] *See Chordia v. Lee*, 2024 WL 49850 (Del. Ch. Jan. 4, 2024), *aff'd*, 339 A.3d 1229 (Del. 2025) (TABLE).

[167] *Id.* at *38.

61

language in *Bobcat* and *Humanigen* that could support that interpretation,[168] but that language attempted to summarize cases where Delaware decisions had applied the exception. Those decisions did not call for a departure from the black-letter principles in the *Restatement* or the illustration demonstrating that a third-party consent requirement does not automatically trigger the assumption-of-risk exception. Other Delaware decisions demonstrate that conditioning performance on a third party's consent right does not automatically trigger the assumption-of-risk exception if a party materially contributed to the failure of the condition by interfering with the third party's decision.[169]

The court cannot apply the assumption-of-risk exception at the pleading stage. Doing so would require drawing defense-friendly inferences and ignoring the well-pled claims for breach of the implied covenant and the Further Action Provision. It is reasonably conceivable that the Operator breached those provisions by convincing or

---

[168] *Humanigen*, 2021 WL 4344172, at *12 ("Delaware courts have applied the prevention doctrine's assumption-of-risk exception when the contract (i) uses explicit language to authorize prevention; or (ii) when 'contract terms condition the consummation of a transaction upon the approval of the other party, or subject one party to the discretion, satisfaction, or decision of the other party or a third-party.'" (quoting *Bobcat*, 2019 WL 1877400, at *7)).

[169] *E.g.*, *Murphy Marine Servs. of Del.*, 2022 WL 4296495, at *12–14 (finding after trial that the prevention doctrine applied where party's performance was conditioned on KPMG issuing a valuation, party was obligated not to interfere with the exercise of KPMG's discretion in reaching a valuation, party materially contributed to KPMG not issuing a valuation by interfering, and party's actions were the "catalyst" for KPMG's withdrawal; "Because there was no explicit assignment of risk or authorization of prevention in the [binding letter agreement], and because both parties were subject to the decision of a third party (that withdrew, in part, because of a party's actions), the assumption of risk exception is not applicable.").

inducing the landlords to withhold consent in a manner that contributed materially to the non-occurrence of the Landlord Consent Requirement. The assumption-of-risk doctrine would not apply in that setting.

### c. The Claim For Breach Of The Sale-Related Negotiation And Arbitration Provisions

In its final claim for breach of the regime governing the Sale-Related Extension Right, the Complaint alleges that the Operator breached the Sale-Related Negotiation and Arbitration Provisions, which required the parties to negotiate the terms of any extensions and arbitrate if disputes persisted. That theory states a claim on which relief can be granted.

The Sale-Related Negotiation Provision required the parties to start negotiating over an extension at least fifteen days before the closing of a sale of the Operator. The Sale-Related Arbitration Provision required the parties to submit any disputes still outstanding forty-five days after closing to an arbitrator. A party would breach the Sale-Related Negotiation Provision if it refused to start negotiating extension terms fifteen days before closing or refused to negotiate reasonably and in good faith. A party would breach the Sale-Related Arbitration Provision if it refused to submit remaining disputes to an arbitrator forty-five days after closing. The Complaint supports an inference that the Operator refused to negotiate reasonably and in good faith as required by the Sale-Related Negotiation Provision and refused to submit disputes to arbitration as required by the Sale-Related Arbitration Provision.

63

The Operator contends the Sale-Related Negotiation and Arbitration Provisions only apply once there is a contractual obligation to extend a concession agreement in the first place. The Operator maintains that once the landlords withheld consent, there no longer could be any obligation to negotiate or arbitrate.

That is one reasonable reading of the Master Agreement. Another reasonable reading is that the Vendor and the Operator had to negotiate over and reach agreement on an extension proposal (or reach an arbitrated result), then present *that proposal* to the landlord for consent. The Operator did not do that, so if that reading is correct, then the Complaint states a claim for breach.

A court can only dismiss a claim for breach of contract if the defendant offers the only reasonable reading. Here, the provision is ambiguous, so the claim for breach of the Sale-Related Negotiation and Arbitration Provisions survives dismissal. Plus, even if the Operator were correct about the sequence, the claim for breach of the Sale-Related Negotiation and Arbitration Provisions would survive because it is reasonably conceivable that the prevention doctrine bars the Operator from relying on the Landlord Consent Requirement. Without the ability to rely on that condition, the Operator owed an obligation to negotiate and arbitrate.

## C. The Superseding Agreement Defense

As a final pleading-stage defense, the Operator argues that all of the Vendor's claims for breach of contract in connection with the Hawai'i Center fail because an amendment that extended the termination date of the Hawai'i Agreement wiped out the Vendor's extension rights under the Master Agreement. That argument is frivolous.

The amendment changed one subsection of the Hawai'i Agreement. In its entirety, the amendment stated:

Section III(A) of the Agreement is hereby amended and restated in its entirety as follows:

"III. TERM

A. The term of the Agreement (the '**Term**') shall be for a period commencing on January 1, 2014 ('**Commencement Date**') and expiring upon the earlier of: (i) June 30, 2025, or (ii) the termination of the Management Agreement (the '**Termination Date**')."[170]

The sole purpose of the amendment was to extend the term of the Hawai'i Agreement by three months.

Nevertheless, the amendment also contained the following integration clause:

Except as specifically modified by this Ninth Amendment, the terms and conditions of the [Hawai'i] Agreement shall remain in full force and effect, and nothing in this Ninth Amendment shall modify or alter the rights and obligations of the parties under the [Hawai'i] Agreement. This Ninth Amendment supersedes all prior oral or written agreements with respect to the subject matter hereof.[171]

The Operator argues that because the "subject matter" of the amendment is an extension of the Hawai'i Agreement, the amendment superseded the Vendor's extension rights under the Master Agreement. In other words, the Operator contends that the Vendor gave up its right to extend the Hawai'i Agreement in exchange for securing the three-month extension.

---

[170] Dkt. 19, Ex. 11, § 2.

[171] *Id.* § 3.

That is a frivolous contention. Under black-letter law, a binding and completely integrated agreement "discharges prior agreements to the extent that they are within its scope."[172] "Where the parties have adopted a writing as a complete and exclusive statement of the terms of the agreement, even consistent additional terms are superseded."[173]

"Delaware decisions apply these blackletter principles."[174] When a prior agreement and a subsequent agreement cover the same subject matter and the subsequent agreement contains an integration clause, the prior agreement "need[s] to be memorialized in [the subsequent agreement]" to survive.[175]

The integration clause provides that the amendment supersedes all prior agreements "with respect to the subject matter hereof."[176] The amendment's sole subject matter was the termination date for the Hawai'i Agreement. It did not cover any other subject matter. Not only that, but similar integration clauses appeared in every prior extension of the Hawai'i Agreement. Undoubtedly creative litigation counsel spotted the integration clause and workshopped the argument, but the

---

[172] Restatement (Second) of Contracts, *supra*, § 213(2).

[173] *Id.* § 213 cmt. c; *accord id.* § 216 cmt. c ("Where there is a binding completely integrated agreement, even consistent additional terms are superseded if they are within the scope of the agreement.").

[174] *Focus Fin. P'rs, LLC v. Holsopple*, 241 A.3d 784, 822–23 (Del. Ch. 2020).

[175] *Hunt v. Limestone Med. Props.*, 2018 WL 2939441, at *4 (Del. Ch. June 11, 2018).

[176] Dkt. 19, Ex. 11, § 3.

argument should have been left on the cutting room floor. The amendment is not a basis for dismissing any of the Vendor's contract claims.

## III.   CONCLUSION

The motion to dismiss is granted as to the alleged breaches of Section 3.2 of the Master Agreement. Otherwise, the motion is denied.